IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

IN RE:       STONY POINT LAND, INC.,                    Case No. 10-31740-KRH
                                                        Chapter 11
                    Debtor.

_____

THOMAS R. HUBBARD and
KATHERINE HUBBARD,

                    Plaintiffs,

v.                                                      APN 10-03107-KRH

STONY POINT LAND, INC.,

                    Defendant.

_____

# MEMORANDUM OPINION

This adversary proceeding presents two issues. First is whether Thomas R. Hubbard and Katherine Hubbard (the "Plaintiffs" or the "Hubbards") are entitled to terminate a real estate contract and obtain a refund of a deposit they paid thereunder. Plaintiffs maintain that the Debtor, Stony Point Land, Inc., (the "Defendant" or "Stony Point") breached its obligation to deliver to them within a reasonable period of time a lot that the Plaintiffs had contracted to purchase from Defendant. Plaintiffs argue that this alleged breach is material and that it excuses their performance under the real estate contract. The second issue (the reverse side of the same coin, in essence) is whether the Defendant is entitled to entry of an order compelling the Plaintiffs to specifically perform their obligations under the real estate contract. Defendant argues that the Hubbards are trying to avoid their obligations under a valid real estate contract

that they signed prior to the downturn in the economy. For the reasons set forth herein, the Court concludes that (i) the Defendant has not breached the real estate contract, (ii) the obligations assumed by parties under the real estate contract remain enforceable, and (iii) the Defendant is entitled to specific enforcement of the real estate contract.

## Procedural Posture

The civil action styled *Thomas R. Hubbard and Katherine P. Hubbard v. Stony Point Land, Inc.*, Case No. CL09-000008, originated in the Circuit Court for the City of Richmond, Virginia with the filing of a complaint (the "Complaint") by the Hubbards against Stony Point on January 5, 2009 (the "State Court Action"). The Complaint alleged in two separate counts (i) a violation of the Virginia Property Owners' Association Act[1] and (ii) a breach of a real estate purchase agreement dated September 21, 2006 (the "Contract"). The Complaint sought the termination of the Contract and the return of a $45,000 deposit that had been paid to bind the Contract. Defendant timely filed an answer denying that it had violated the Virginia Property Owners' Association Act and denying that it had breached the Contract. Stony Point filed a counterclaim against the Plaintiffs requesting the entry of an order compelling the Plaintiffs to specifically perform their obligations under the Contract or in the alternative an award of damages (the "Counterclaim").

On September 29, 2009, Judge Richard Taylor, Jr. of the Circuit Court of the City of Richmond, ruling that Stony Point had made valid delivery of the Property Owners' Association disclosure packet pursuant to the Virginia Property Owners' Association Act, entered an Order in which he dismissed Count I of the Complaint. By Order entered October 8, 2009, Judge Taylor denied Defendant's Motion for Partial Summary Judgment and in Limine in connection with

---

[1] Va. Code §§ 55-508, *et seq.*

Count II of the Complaint. On October 13, 2009, Stony Point non-suited Count II of its counterclaim wherein it had asserted its alternative claim for damages for breach of contract.

The Defendant filed a voluntary petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Court") on March 12, 2010. Defendant timely filed a notice of removal of the State Court Action to this Court on June 9, 2010, in accordance with Rule 9027 of the Federal Rules of Bankruptcy Procedure. The only claims that remained in the State Court Action upon removal were Count II of the Hubbards' Complaint for breach of contract and Count I of Stony Point's Counterclaim for specific performance.[2]

A two day trial was conducted in this Court on January 10 and 11, 2011 (the "Trial"). The parties presented the testimony of five witnesses and introduced voluminous exhibits. The Court announced its ruling in favor of the Defendant when the Trial concluded on the second day. This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law consistent therewith in accordance with Rule 7052 of the Rules of Bankruptcy Procedure and Rule 25 of the Federal Rules of Civil Procedure.[3]

### Jurisdiction

The matters at issue in this adversary proceeding relate to the administration and disposition of property of the bankruptcy estate of Stony Point Land, Inc. and to the adjudication

---

[2] Rule 9027(i) provides that "[a]ll . . . orders entered and other proceedings had prior to removal shall remain in full force and effect . . . ." As Judge Taylor's orders dealt with issues pertaining to Virginia substantive law (a subject with which the state tribunal is very familiar) this Court declined to revisit those rulings made prior to the removal of this action, and the parties' objections to Judge Taylor's rulings are preserved.

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

3

of claims asserted against the bankruptcy estate.[4] The Court has subject matter jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 157(a), 1334 and 1452 and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C), (N) and (O) in which final orders or judgments may be rendered by a bankruptcy judge. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1409(a).

## Facts

On September 21, 2006, the Hubbards entered into a Contract with Stony Point, under which Contract the Hubbards agreed to purchase and Stony Point agreed to sell Lot 2 in a proposed high-end, 13-lot subdivision that was to be built by Stony Point along the banks of the James River in the City of Richmond. The proposed development was known as Riverwatch. The purchase price for Lot 2 under the terms set forth in the Contract was $450,000. The Hubbards were required to pay a deposit of $45,000 upon execution of the Contract. The Contract did not contain a specific closing date. Rather, the Contract provided that closing had to occur "not later than ten (10) days following receipt by [the Plaintiffs] of notice from [the Defendant] that [Defendant] has completed the Phase One Infrastructure (as hereinafter defined)." The term "Phase One Infrastructure" was defined in section 8 of the Contract to include "improvements necessary for issuance by the City of permits for the construction of a residential dwelling on lots within the subdivision, including (i) a road providing access to the Lot from Cherokee Road and an emergency access road as required by the City, each as shown on the subdivision plat (collectively, the "Roads") exclusive of the top coat of asphalt; and (ii)

---

[4] On July 8, 2010, the Hubbards filed a joint proof of claim which was designated as claim number 2 in the underlying bankruptcy case (Case Number 10-31740). The proof of claim was amended on July 14, 2010 and claims a total amount of $450,000.

4

the extension of gas, water, sanitary sewer, electric, telephone and cable utilities to the Lot." At the time the Contact was executed by the parties, Stony Point had not yet received final approval of its subdivision plat from the City of Richmond (the "City"). Nor had the permits allowing for the commencement of the construction of the Phase One Infrastructure been issued. The parties acknowledged these facts in section 8 of the Contract.

The Contract also did not contain a time requirement for Stony Point to complete the Phase One Infrastructure. There was no provision in the Contract that allowed the Hubbards to terminate the Contract if the Phase One Infrastructure was not completed by a date certain.[5] In lieu of any specified date for completion, section 8 of the Contract provided that Stony Point was required to "commence construction of the Phase One Infrastructure as soon as practicable after issuance of the permits by the City," and that it was required thereafter to "diligently pursue completion thereof."

The parcel of property upon which the Riverwatch subdivision was to be developed consisted of approximately six acres of flood plain along the James River and of approximately 20 acres of unimproved steep wooded land rising 70 feet above the flood plain. Cherokee Road intersects the property and provides access to it. A number of the lots, including Lot 2, provided scenic views of the James River. The topography of the property including its elevation, the proximity of the property to the James River, and the convenient location of the property within the City made the lots in the Riverwatch subdivision very desirable.

At the time the Contract was executed by the parties, demand for building lots was very high in the Richmond metropolitan area. This demand most notably extended to the prime

---

[5] By contrast, under section 15 of the Contract, the Defendant, at its sole option, did have the right to terminate the Contract upon certain contingencies which included any unforeseen circumstances that the Defendant might encounter which would render development of the subdivision economically infeasible as determined by the Defendant. There were no such contingencies under which the Plaintiffs were allowed to terminate the Contract.

building lots in the proposed Riverwatch subdivision with its commanding views of the river. Contracts for the purchase of ten of the 13 lots in the proposed Riverwatch subdivision had already been executed in the fall of 2006, even though no work had been commenced on the Phase One Infrastructure and even though the necessary permits that would allow commencement of the construction had not yet been approved by the City. Indeed, the Hubbards had not visited or even seen the property at the time they executed their Contract to purchase Lot 2 and paid their $45,000 deposit.[6]

The topography of the property which served to make the lots in the proposed Riverwatch subdivision desirable also presented challenges in connection with the construction of the Phase One Infrastructure. Both Mark Putney, the president of Stony Point, and Mark Kukoski, the expert witness who was called on behalf of the Defendant, testified that contracts (such as the Contract at issue in this case) for the sale of lots in a subdivision that had not begun development typically do not have specific closing dates. This is because the complexities and difficulties inherent in land development, the delays in obtaining necessary permits from political subdivisions and from regulatory agencies, the unforeseen problems that often occur once construction and land disturbance begins, and other factors beyond the developer's control all make it impossible to predict when the work will be completed. Extensive work was required to complete the Phase One Infrastructure in the proposed Riverwatch subdivision. This work included land clearing, excavation site work, road construction, erosion and sediment control, storm water management, and the extension of utility services including water, sewer, electricity and cable television.

---

[6] The Hubbards were living in the State of Washington near Seattle at that time.

When the Contract was executed, Defendant had hoped that the Phase One Infrastructure might be completed by the summer of 2007.[7] Defendant had expected the permits necessary to allow the construction of the Phase One Infrastructure to commence would be issued by the City by the end of September 2006. The City, however, did not issue the necessary permits until January 24, 2007. The evidence was uncontroverted that Stony Point commenced construction of the Phase One Infrastructure during the following week.

Stony Point did encounter unexpected problems during its construction of the Phase One Infrastructure. While these problems and the resulting delays in completion of the construction were unforeseen, the undisputed testimony of both Messrs. Kukoski and Putney was that unforeseen problems and associated delays often occur in connection with projects of this type.

The first problem the Defendant encountered in the construction of the Phase One Infrastructure was the unexpected discovery of rock deposits in areas in which it was previously thought rock would not be located. The discovery was unexpected because bore-drilling tests had been performed to determine the presence of rock well before construction was commenced. The tests had not revealed the rock deposits that were subsequently uncovered. The presence of rock necessitated blasting activities so that the rock could be removed. The blasting could not be performed until a new permit was issued by the City of Richmond. A further complicating factor was that only a few contractors in the Richmond metropolitan area were capable of doing the blasting. The rock deposits interfered with the construction of the roads and caused significant delays in the progress of the project.

---

[7] Mr. Putney testified that Stony Point was most anxious to get the Phase One Infrastructure completed as quickly as possible. Stony Point had outstanding bank loans, for which he and his wife were personally liable, that had been procured to finance the cost of development. The loans were accruing interest monthly. The sooner Stony Point could complete the Phase One Infrastructure and begin closing on the lot sales, the sooner it could retire its bank debt.

The second issue that caused problems that slowed construction involved a request from the City inspector for changes in the utility plans that had previously been approved by the City. These changes required modification of the approved method for connecting the new sewer lines from the Riverwatch subdivision to the City's main sewer line under Cherokee Road. The engineering plans had to be revised and submitted for re-approval by the City of Richmond. Once approved, new substitute piping materials had to be fabricated. This change resulted in significant delay.

The next problem experienced by the Defendant also involved the sewer line. The area of the City in which the Riverwatch development is located was formerly part of the County of Chesterfield, which was annexed by the City. The main sewer trunk line to which Stony Point planned to connect the Riverwatch sewer system was built by the County and inherited by the City upon annexation. During installation of the Riverwatch sewer system, it was discovered that the City's main sewer line under Cherokee Road, which sewer line serves a large area of the City, was encased in concrete. Not even the City of Richmond had been aware of this condition. This unforeseen circumstance required the redesign of the sanitary sewer system in the Riverwatch development which, in turn, required new approvals by the City of Richmond, all of which occurred well after the sewer project was underway. The City had to engage its own independent expert to advise it in the best manner for the Riverwatch sewer line to be connected to the City's main sewer line and the best way to ensure that sewage did not flow into the James River. This problem caused a three-month delay in the construction of the Phase One Infrastructure.

The next problem to befall the project was the City's unexpected requirement in early 2008 for the partial redesign of the water lines serving the Riverwatch subdivision. The redesign caused further delays in the construction.

The steep topography of the project presented its own unique set of problems. In the summer of 2008, the City of Richmond abruptly decided that, due to the hilly topography, it would be necessary to change the location of the natural gas lines in Riverwatch from outside the curb of the subdivision's main road, as the City had originally approved, to the center line of the road. As a result, paving of the road had to be put on hold until the City could revise its engineering plans for the gas line and until the installation of the gas line in the new location could be completed. Exacerbating this problem was the fact that the pavement delay occurred during a time of significant rainfall in the City of Richmond. The heavy rainfall combined with the steep slope of the road caused extensive washouts that undermined the recently installed curbing and guttering, all of which had to be replaced. The record rainfall also necessitated additional erosion and sediment control work to be performed.

Finally, Dominion Virginia Power, in a reversal of its informal policy that had long been in place prior to the summer of 2008, suddenly required that the foundation of the first house in a subdivision be in place before Dominion Virginia Power would begin installing electric lines to the subdivision. This caused a four-month delay in the completion of the Phase One Infrastructure from August to December of 2008.

Notably, all of the problems that were encountered with the construction of the Phase One Infrastructure were beyond the Defendant's control. The undisputed testimony of Mr. Kukoski at Trial was that when constructing a residential development, like the proposed Riverwatch subdivision, on a piece of undeveloped property, the different items of work must be staged in a

9

particular sequence. When problems occur with one phase of the project, it is not possible for the developer to skip over to another stage of development while the problem is being resolved. The work has to be performed in a necessary sequence. For example, sewer lines must be installed before water lines, as sewer lines are installed deeper. When problems occurred in Riverwatch with the installation of the sewer lines, it necessitated a delay in the installation of the water lines. This necessary sequencing held true for almost every stage of the construction of the Phase One Infrastructure in the Riverwatch subdivision.

The Court finds that Stony Point commenced construction of the Phase One Infrastructure as soon as practicable after the issuance of the necessary permits by the City of Richmond. The Court also finds that Stony Point diligently pursued the completion of the Phase One Infrastructure once the necessary permits had been obtained. Stony Point did nothing to unreasonably delay the completion of the Phase One Infrastructure.

The Hubbards did not move to Richmond from the State of Washington until August 2007. At that time, they were in no hurry to close on the Contract. It was not until the end of May 2008 that the Plaintiffs first voiced any displeasure to the Defendant about the time it was taking to complete the Phase One Infrastructure. On August 28, 2008, Plaintiffs advised the Defendant that they did not intend to close on the Contract on the grounds that it had taken Defendant an unreasonable length of time to complete the Phase One Infrastructure. By that time, Stony Point had completed virtually all of the Phase One Infrastructure and was awaiting only the installation of the underground electric line to serve the subdivision by Dominion Virginia Power. Dominion Virginia Power finished its work in early December 2008. By letter dated December 6, 2008, Stony Point notified the Hubbards that the Phase One Infrastructure

was complete and that closing on the sale of Lot 2 should occur as provided in the Contract within ten days.

The Plaintiffs presented no expert testimony at Trial to support their contention of unreasonable delay. Nor did they offer any other testimony from a person knowledgeable in the subject of real estate development that the time it took the Defendant to complete the Phase One Infrastructure was unreasonable. The Contract involved the sale of a lot in an undeveloped subdivision. The undisputed testimony was that such contracts often run into delays. The fact that this subdivision was at the very earliest stages of development when the Contract was signed made delays both more likely and not at all unreasonable. The time it took the Defendant to complete the Phase One Infrastructure, taking into consideration all of the work that had to be performed and all of the issues that the Defendant confronted, was not unreasonable. Furthermore, Stony Point diligently pursued the completion of the Phase One Infrastructure from the moment it received the necessary permits allowing it to commence construction.

After the Plaintiffs filed their complaint for breach of contract in the State Court, the Defendant attempted to mitigate its damages through remarketing efforts to resell Lot 2 to some third party. Defendant's efforts in this regard were unsuccessful. Throughout the period Stony Point attempted to mitigate its damages, however, Defendant maintained the position it asserted in its Counterclaim that the Plaintiffs were obligated to perform their obligations under the Contract. At all times, Stony Point remained ready, willing and able to convey Lot 2 to the Plaintiffs.

## Analysis

The Hubbards bear the burden of proving that the Defendant breached the Contract and, if so, that the breach was a material one that would excuse performance by the Hubbards of their

obligations under the Contract. *See, e.g.*, *Brooks v. Worthington,* 206 Va. 352, 359 (1965) ("[T]he burden of proof is always on the plaintiff to establish his case."); *Horton v. Horton,* 254 Va. 111, 116 (1997). Stony Point bears the burden of proving that it is entitled to specific performance. *Horton v. Horton,* 254 Va. at 116. Virginia law applies to this adversary proceeding. *See, e.g.*, *Ambrose Branch Coal Co., Inc. v. Tankersley,* 106 B.R. 462, 466 (Bankr. W.D. Va. 1989) ("[T]he *Erie* doctrine applies, whatever the ground for federal jurisdiction, to any issue or claim which has its source in state law.") (quoting *Maternally Yours v. Your Maternity Shop*, 234 F.2d 538, 539 n.1 (2d Cir. 1956)). Paragraph 14 of the Contract specifies that Virginia law governs the construction of the Contract.

Virginia law implies a reasonable time requirement for the completion of a contract. What constitutes a reasonable time is a fluid concept that requires scrutiny of not only the composition and subject matter of the contract but also the factual circumstances that surround it. *Va. Hot Springs Co. v. Schreck,* 131 Va. 581, 585 (1921) ("What is a reasonable time is a very indefinite term, varying as to the act to be done and the circumstances of the particular case."). The Court must look at all of the facts and circumstances of a particular case in order to determine what constitutes a reasonable time. *See Plaskitt v. Black Diamond Trailer Co.,* 209 Va. 460, 467–68 (1968); *Adams v. Doughtie,* 63 Va. Cir. 505 (Va. Cir. Ct. 2003); *F. L. Hall, Inc. v. Warehouse Landing Assocs.,* 38 Va. Cir. 181, 183 (Va. Cir. Ct. 1995) ("In determining what is a reasonable time, 'the circumstances to be considered have a wide range: they include the nature of the proposed contract, the purposes of the parties, the course of dealing between them, and any relevant usages of trade.'") (quoting Restatement (Second) of Contracts § 41 cmt. B (1979)); *accord United States v. 2974.49 Acres of Land*, 308 F.2d 641, 643 (4th Cir. 1962) ("[I]n the determination of what constitutes a reasonable time . . . the nature of the subject matter, the

object of the contract and the situation and conduct of the parties and all other circumstances should be taken into consideration."); 17A Am. Jur. 2d *Contracts* § 468 (2010).

The Hubbards maintain in paragraph 3 of their Complaint that Defendant breached the Contract because it took Stony Point an unreasonable length of time to make delivery of Lot 2. The Hubbards have not met their burden on this point. The Contract permitted closing to occur on the sale of Lot 2 at any time after the City of Richmond approved the final subdivision plat for Riverwatch.[8] Completion of the Phase One Infrastructure only triggered the outside date by which the Hubbards were required to close. The closing contingency in the Contract was satisfied on February 23, 2007 when the subdivision plat was finally approved. Lot 2 was ready for delivery to the Hubbards any time thereafter. The Hubbards did not arrive in the Richmond area until later that same year and even then were in no hurry to take delivery of the lot. The Court concludes that the time lapse between the date upon which the Contract was executed and the date upon which Stony Point was able to make delivery of Lot 2 was not of unreasonable length.

Nor have the Hubbards met their burden of proving that the time it took Stony Point to complete the Phase One Infrastructure in this case was unreasonable. The implied requirement that contract terms are to be performed within a reasonable time when there is no time specified in the contract applies only to terms under the control of the parties. *Ryland Group, Inc. v. Wills*, 229 Va. 459, 467 (1985). The problems that caused the delays in the completion of the Phase One Infrastructure were beyond Defendant's control. Taking into consideration that the Contract for the sale of Lot 2 involved an undeveloped subdivision, that substantial work was required to be performed to complete the infrastructure and that unforeseen but not untypical delays often

---

[8] The testimony elicited at Trial was that at least one of the ten lots in the Riverwatch subdivision that was under contract as of the fall of 2006 closed prior to the completion of the Phase One Infrastructure.

13

occur in such construction projects, the length of time it took for the Defendant to complete the Phase One Infrastructure was not unreasonable.

Plaintiffs' performance under the Contract is not excused due to the time it took for the outside contingency triggering Plaintiffs' obligation to close to be satisfied. The Court will not rewrite the parties' Contract. It will not insert a new contingency into the Contract allowing Plaintiffs to terminate the Contract where the parties themselves did not see fit to include such a contingency in the Contract at the time of execution. The Defendant is entitled to the benefit of the bargain it struck with the Plaintiffs. The Contract remains enforceable pursuant to its terms.

Whereas Plaintiffs have failed to carry their burden of proof, Defendant has established that it is entitled to the relief requested in its Counterclaim. Stony Point has proven that it commenced work on the Phase One Infrastructure as soon as it was practicable to do so after issuance of the necessary permits by the City and that it diligently pursued completion of the work thereafter. Bankruptcy courts have injunctive powers under 11 U.S.C. § 105(a) that include the power to issue a decree of specific performance of a contract. *Stokes v. Firestone (In re Stokes)*, 198 B.R. 168, 175 (E.D. Va. 1996). Specific performance is granted as a matter of course under Virginia law where one party has unjustifiably refused to perform as required by a binding real estate contract. *See Allen v. Lindstrom*, 237 Va. 489, 497 (1989), *cert. denied*, 493 U.S. 849 (1989); *Yamada v. McLeod*, 243 Va. 426, 432–33 (1992); *see also City of Manassas v. Board of County Supervisors*, 250 Va. 126, 133 (1995) ("Although it is not a matter of absolute right, 'where the contract sought to be enforced is proved and is in its nature and circumstances unobjectionable, it is as much a matter of course for courts of equity to decree specific performance as it is for a court of law to give damages for breach of it.'") (quoting *Haythe v. May*, 223 Va. 359, 361 (1982) (quoting *Pavlock v. Gallop*, 207 Va. 989, 995 (1967))).

It is well established under Virginia law that specific performance can be ordered in favor of sellers of real estate as well as purchasers. *See Yamada*, 243 Va. at 432–33 (rejecting the argument that the availability of damages precluded granting specific performance, and affirming an order requiring real estate purchasers to specifically perform the contract); *Cogito v. Dart*, 183 Va. 882 (1945) (affirming an award in favor of a real estate seller in compelling specific performance from the buyer); *Goins v. Garber*, 131 Va. 59 (1921); *Dunn v. Stowers*, 104 Va. 290 (1905); *Farris v. Hughes*, 89 Va. 930 (1893); *Ayres v. Robins*, 71 Va. (30 Gratt.) 105, 115–16 (1878).[9] Under Virginia law, both the purchaser and the seller under a real estate contract are entitled to the remedy of specific performance for a breach. *Ferebee v. Andre*, 31 Va. Cir. 243, 248 (Va. Cir. Ct. 1993); *see also Roland v. Levin (In re Roland)*, No. 96-27648, APN 97-22434, 1998 Bankr. LEXIS 219, at *23–24 (Bankr. E.D. Va. Feb. 18, 1998) (concluding that "specific performance is an available remedy" against a purchaser that tried to back out of a real estate contract). Contracts for the sale of real estate have always enjoyed a particular amenability to specific performance under Virginia law. *Stokes*, 198 B.R. at 180.

Lastly, Plaintiffs argue that the Defendant abandoned the Contract when Stony Point attempted to mitigate its damages by remarketing Lot 2 after the filing of Plaintiffs' Complaint. Abandonment of the Contract is a defense which should properly have been raised in the Plaintiffs' responsive pleadings to the Counterclaim. Plaintiffs did not raise the defense in their pleadings nor did they raise the defense at any time prior to the conclusion of Mr. Putney's testimony at Trial. Accordingly, Plaintiffs have waived any defense of abandonment.

---

[9] Allowing sellers of real estate to obtain specific performance serves two important purposes, simultaneously affording the vendor a complete remedy and complying with the principle of mutuality. *Ayres v. Robins*, 71 Va. (30 Gratt.) at 116; *see also Yamada*, 234 Va. at 433 (noting that the two reasons for granting specific performance in *Ayres* were "to give the seller . . . complete relief" and "to comply with the principle of mutuality that compels courts of equity to give [the parties] the same relief.").

15

But even so, Stony Point did not abandon the Contract merely by attempting to mitigate its damages. Stony Point had a duty to mitigate, which it did, even as it sought specific performance of the Contract. Stony Point never departed from its efforts to enforce the Contract as it demanded in its Counterclaim. The Court finds that, at all times, Defendant remained ready, willing and able to close on the sale of Lot 2 to the Plaintiffs, even after it commenced its re-marketing efforts. It remains ready, willing and able to convey the Lot today.

Accordingly, the Defendant is entitled to an award of specific performance against Plaintiffs in this case. In addition, Defendant is entitled under Va. Code § 6.2–301 to an award of interest at the legal rate of 6% per year on the unpaid balance of the purchase price of $405,000 from December 16, 2008 (the outside date on which the Contract required the Plaintiffs to close) until paid. Finally, Defendant is entitled to recover its costs in this proceeding, including the $250 filing fee for the Notice of Removal. Fed R. Bankr. P. 7054(b); Local Rule 7054–1.

## CONCLUSION

For the reasons set forth herein, the Court will enter judgment in favor of Defendant against the Plaintiffs. The parties' Contract remains fully enforceable. The Plaintiffs will be ordered to specifically perform their obligations under the Contract, including payment of the $405,000 balance owed in connection with the purchase of Lot 2. Closing shall occur within 15 days of the entry of the Court's Order. At closing, the Hubbards will be required to pay, in addition to the balance owed under the Contract, interest on the $405,000 balance at the rate of 6% per year from December 16, 2008 until paid in full. Defendant is also entitled to recover the costs it has incurred in this proceeding. A separate order shall issue.

ENTERED: _____

                                          /s/ Kevin R. Huennekens
                                UNITED STATES BANKRUPTCY JUDGE